**Andrew M. Calamari**
**Sanjay Wadhwa**
**Michael D. Paley**
**Wendy B. Tepperman**
**Preethi Krishnamurthy**
**Joshua R. Geller**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0116 (Krishnamurthy)**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | |
| : | |
| -against- : | **COMPLAINT AND** |
| : | **JURY DEMAND** |
| PHILIP THOMAS KUEBER, : | |
| : | |
| Defendant. : | |
| : | |

---

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendant Philip Thomas Kueber ("Kueber" or "Defendant"), alleges:

### SUMMARY

1. Kueber orchestrated a fraudulent investment scheme through microcap issuer Cynk Technology Corp. ("Cynk").

2. By using nominee CEOs, straw shareholders, and offshore international business corporations ("IBCs"), Kueber concealed his control of Cynk and its purportedly non-restricted securities.

3. While under Kueber's control, Cynk filed a Form S-1 registration statement containing false and misleading information. The Form S-1 statement enabled Cynk to issue purportedly non-restricted shares.

4. Kueber then gave certain straw shareholders — his family members and associates — funds to purchase Cynk shares in their names, but Kueber retained control of the shares.

5. Kueber next obtained false and misleading declarations from the straw shareholders and provided the documents to the Financial Industry Regulatory Authority ("FINRA") so that FINRA would allow Cynk's stock prices to be quoted on an interdealer quotation system.

6. Kueber then transferred the purportedly non-restricted shares held by the straw shareholders to brokerage accounts and the offshore IBCs he secretly controlled. To do so, Kueber misled at least one broker-dealer about his beneficial ownership of the shares. Robert Bandfield and/or his firm IPC Corporate Services ("IPC") — defendants in *SEC v. Bandfield, et al.*, 14-cv-5271 (ILG) (RER) (E.D.N.Y.) — created these IBCs.

7. At all relevant times, Cynk had no revenue or operations. From January 2 through June 16, 2014, Cynk's stock never traded for more than ten cents per share.

8. Between June 17 and July 10, 2014, Cynk's share price skyrocketed. On July 10, 2014, Cynk traded at over $21 per share, resulting in a market capitalization of more than $4.5 billion.

9. On July 11, 2014, the SEC issued an order suspending trading in Cynk shares for ten trading days, preventing Kueber from selling the shares he controlled during that time.

## **VIOLATIONS**

10. By virtue of the foregoing conduct and as alleged further herein, Kueber, directly or indirectly, violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)],

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

11. Unless Kueber is permanently restrained and enjoined, he will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

12. The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

13. The Commission seeks a final judgment:

   a) permanently restraining and enjoining Defendant from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

   b) permanently prohibiting Defendant from participating in any offering of a penny stock, pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)];

   c) barring Defendant from serving as an officer or director of any public company, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

   d) ordering Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

   e) any other relief the Court may deem just and appropriate.

3

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendant, either directly or indirectly, has made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges, and/or the means or instruments of transportation or communication in interstate commerce in connection with the acts, practices, and courses of business alleged herein.

15. Venue lies in the Eastern District of New York under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Individuals residing in Brooklyn, New York and other locations within the Eastern District of New York purchased Cynk's securities.

## DEFENDANT

16. **Kueber**, age 54, is a Canadian citizen. At times, Kueber has used other names, including "Phil Thomas," "Philip Thomas," and "Philip Keeber."

## RELEVANT ISSUER

17. **Cynk** is a Nevada corporation. From its incorporation in 2008 until June 21, 2013, it existed under the name Introbuzz. On June 21, 2013, the company amended its Articles of Incorporation to change its name to Cynk Technology Corp. As of June 17, 2014, the company's common stock (ticker "CYNK") was quoted on OTC Link operated by OTC Markets Group, Inc. ("OTC Link"), an interdealer electronic quotation system.

## FACTS

### A. Kueber Forms and Controls Cynk

18. In 2008, Kueber's brother incorporated Cynk in Nevada under the name Introbuzz. Its purported business plan was to create a social network website.

19. In 2009, Kueber established the company's website, www.introbiz.com, by registering it with GoDaddy, an internet domain name registrar. To do so, Kueber used an account in the name of an entity he controlled, for which he served as president.

20. In October 2011, Kueber purchased a similarly-named website, introbiz.co.

21. The same month, Kueber paid filing fees to the Nevada Secretary of State to reinstate Cynk as a Nevada corporation.

22. In 2012, Kueber paid to renew the registration for www.introbiz.com twice.

23. At various times, Cynk used an email address, introbuzz@gmail.com, that Kueber used.

24. In January 2012, Kueber opened a bank account for Cynk at a United States bank ("Bank A") — Cynk's first and only bank account at the time.

25. To open the account, Kueber provided a corporate resolution and a signature card he signed. The corporate resolution listed Kueber as Cynk's president, and Kueber similarly listed himself as Cynk's president on his signed signature card.

26. Kueber was the sole signatory on the bank account.

27. In September 2012, Cynk submitted to Bank A a second corporate resolution and a signature card Kueber signed. Both documents again listed Kueber as Cynk's president and added another individual, purportedly Cynk's "secretary," to the account.

28. In November 2012, Cynk's Bank A account was closed.

29. To conceal his control of Cynk, Kueber used nominee CEOs.

5

30. Kueber's first such nominee CEO was his brother.

31. In early October 2011, Kueber's brother resigned from Cynk's board of directors.

32. In mid-October 2011, Kueber's brother sold his Cynk shares to another individual, who replaced Kueber's brother as Cynk's CEO.

33. Between April 2013 and July 2014, Cynk cycled through at least two more nominee CEOs.

34. These nominee CEOs were the only officers whose names appeared on the company's public filings. Cynk's public filings never disclosed Kueber's name.

35. None of the nominee CEOs had experience running a social media company. For example, one was a partner in a medical services business, and another was a fisheries officer for the Belize government.

36. In October 2012, one of the nominee CEOs opened a second bank account for Cynk at another United States bank ("Bank B").

37. Most, if not all, of the money deposited into Cynk's Bank B account came from Kueber, through two other entities he controlled.

**B.     The Form S-1 Registration Statement**

38. To enable Cynk to issue purportedly non-restricted shares, Kueber sought to register Cynk's offering of shares with the Commission using a Form S-1 registration statement.

39. To do so, Kueber needed to have Cynk audited.

40. In December 2011, Kueber engaged an auditor ("the Auditor"). The Auditor addressed his engagement letter to Kueber and called Kueber a "Director" of Cynk.

41. In mid-January 2012, the Auditor asked Kueber — not Cynk's then-CEO — about an outstanding Cynk loan, and Kueber answered.

42. In late January 2012, Cynk filed a Form S-1 registration statement with the Commission registering an offering of 2,000,000 shares so that it could issue purportedly non-restricted securities and later seek to have its shares quoted on an interdealer quotation system such as OTC Link.

43. Cynk's Form S-1 filing, which included the Auditor's audit opinion, did not disclose Kueber's control of the company. The S-1 filing did not name Kueber as a control person, beneficial owner of Cynk's stock, or as a Cynk promoter.

44. Instead, the Form S-1 statement represented that the then-nominee CEO served as Cynk's sole officer, director, and control person and the sole beneficial owner of Cynk's stock.

**C.     Kueber's Use of Straw Shareholders**

45. On June 1, 2012, Cynk's S-1 registration became effective.

46. Thereafter, Cynk purportedly sold 1,086,000 shares to the public.

47. In reality, Cynk issued most or all of the shares to Kueber's relatives, friends, or other people connected to Kueber (the "straw shareholders").

48. Kueber solicited some or all of the straw shareholders to participate in the offering and provided the money some or all of the straw shareholders used to pay for the shares.

49. For example, on June 12, 2012, Kueber emailed two individuals and asked them to become Cynk shareholders. He told them he would wire them the money to pay for the Cynk shares. About two weeks later, Kueber again emailed these individuals and told them he had wired them the money to pay for the shares. He asked them to fill out subscription agreements for Cynk stock and send the signed subscription agreements with cashiers' checks for the share purchases to Cynk's attorney.

50. The straw shareholders never received the shares they had "purchased."

### D.     The Form 211 Process

51.     Once the Form S-1 registration statement became effective and the company's shares were in the hands of Kueber's straw shareholders, Kueber sought to have Cynk's shares quoted on an interdealer quotation system such as OTC Link. That would enable him to sell the shares he controlled to the investing public in the United States.

52.     To do so, Kueber used a United States introducing broker (the "Broker") and its affiliated clearing broker (the "Clearing Broker").

53.     On October 11, 2012, the Clearing Broker applied to become a market maker for Cynk by filing a Form 211 with FINRA.

54.     On November 12, 2012, FINRA informed the Clearing Broker that its Form 211 application "remain[ed] deficient" and questioned the fact, which FINRA deemed a "red flag," that most of Cynk's "non-restricted" shares were concentrated among seven shareholders.

55.     On November 28, 2012, the Clearing Broker replied that six individuals each owned 100,000 shares of Cynk, including "4 individuals in the same town in Canada and two individuals in the same town in California" and noted that FINRA's "concerns are reasonable."

56.     The Clearing Broker attached a letter from Cynk's attorney. Cynk's attorney represented, "based on discussions with representatives of" Cynk, that the "Officers" of Cynk "grew up in Kelowna, B[ritish] C[olumbia] and Rancho Santa Margarita, CA," where six of the shareholders FINRA had questioned also resided. Cynk's attorney opined that none of these shareholders were "affiliates" of each other or Cynk because none was a Cynk officer or director, none shared the same address or last name with another such shareholder, and none owned over 10% of Cynk's shares.

57.     On December 10, 2012, FINRA responded to the Clearing Broker, confirmed that it was not satisfied with this response, and requested "a detailed description of the steps [the Clearing

Firm] has taken to verify that no arrangement or understanding exists between any of the 7 individuals" who owned most of Cynk's "non-restricted" shares.

58. Four days later, to deceive FINRA, Kueber provided identical declarations to at least two of these seven straw shareholders for their signatures.

59. The form declarations falsely stated: (1) "I solely and exclusively own and control the shares for which I have subscribed;" (2) "no arrangement or understanding exists between me and any other individuals or entities as to the disposition of these securities;" and (3) "I am not acting in concert with any others as to my ownership, control, or disposition of these securities."

60. All seven straw shareholders signed these identical declarations, and the Clearing Broker provided all seven declarations to FINRA.

61. On January 8, 2013, FINRA again notified the Clearing Broker that the Form 211 application was "deficient."

62. On January 10, 2013, the straw shareholders each signed lock-up agreements with Cynk. The agreements purported to prevent the straw shareholders from selling their Cynk shares for one year from the original purchase dates in approximately June 2012.

63. FINRA allowed the Form 211 to become effective on February 6, 2013, which enabled the Clearing Firm to enter quotations for Cynk's shares.

64. Less than a week later, the Clearing Firm began to enter quotations into OTC Link. Other brokers were then permitted to enter price quotations of their own, thereby creating a market for Cynk's shares.

65. Investors later began purchasing the shares.

E. **Kueber Transferred the Shares to His IBCs**

66. IPC, an offshore asset concealment firm, created offshore IBCs with nominee owners and officers and offshore brokerage firms to help its clients conceal their true beneficial

9

ownership of shares in publicly traded, microcap companies in the United States and evade the Commission's reporting requirements.

67. Bandfield and/or IPC created at least three IBCs that Kueber used: Digital Systems Ltd. ("Digital Systems"), Cyberworld Networks ("Cyberworld"), and Icefox Networks ("Icefox").

68. Notwithstanding the seven straw shareholders' declarations, these straw shareholders transferred all their previously-obtained Cynk shares to Kueber and his IBCs by approximately July 2013. Indeed, two of the seven straw shareholders also violated the lock-up agreements and transferred the shares before the lock-up period had expired.

69. Kueber used the IBCs to conceal his ownership and control of Cynk shares.

**F.    Kueber Changed the Name of the Company from Introbuzz to Cynk**

70. In May 2013, Kueber — using the name "Phil Keeber" and an address in Beverly Hills, California — reserved the name "Cynk Technology Corp." for a Nevada business entity.

71. The following month, Kueber, again as "Phil Keeber," signed a name reservation release in California before a notary public. The release consented to Introbuzz's use of the name Cynk Technology Corp.

**G.    Kueber Moved the Shares From His IBCs to His Offshore Brokerage Firm**

72. Kueber next moved the Cynk shares from his offshore IBCs into accounts in the name of Clear Water Securities, Inc. ("Clear Water"), an offshore brokerage firm Kueber controlled, where he could trade them in United States omnibus trading accounts.

73. Clear Water held accounts in its name at United States brokerage firms.

74. To further obscure the beneficial owner of the shares it traded, Clear Water held accounts in its name at yet another offshore brokerage firm. That offshore brokerage firm in turn held omnibus United States trading accounts in its name through which Clear Water could sell shares. This structure not only helped conceal the underlying beneficial owner of the shares Clear

Water traded but also spread out deposits and subsequent sales across multiple firms to avoid scrutiny.

75. By late July 2013, Clear Water held, for the benefit of Kueber's three IBCs, virtually all the Cynk shares issued under the original Form S-1 registration statement.

76. To deposit the Cynk shares into one of Clear Water's brokerage accounts, Kueber made false representations to a broker-dealer about the beneficial ownership of the Cynk shares.

77. In June 2013, Kueber sent a broker-dealer firm, directly or indirectly, two beneficial ownership declarations representing that two different IBCs, Digital Systems and Icefox, owned the Cynk shares; that the Chinese national signing on behalf of each IBC exclusively owned the Cynk shares beneficially; and that neither of these purported beneficial owners of Cynk shares was a control person, officer, director, or founder of Cynk or promoted the purchases or sales of Cynk's shares on Cynk's behalf.

78. Kueber signed each declaration as "the investment adviser" for the account and "represent[ed] and warrant[ed]" that he was "not aware of any material facts, which are inconsistent with, or which have been omitted from, the facts recited in the declaration."

79. In fact, as Kueber knew, Kueber himself beneficially owned these Cynk shares. Kueber, not the two Chinese nationals, beneficially owned and controlled the two IBCs.

**H.  The Trading Suspension**

80. At all relevant times, Cynk had no revenues or operations.

81. From 2013 through at least July 2014, the total value of Cynk's assets never exceeded $1,400.

82. From at least January 2 through June 16, 2014, Cynk's stock never traded for more than ten cents per share.

83. Starting on June 17, 2014, the price of Cynk's shares began to climb.

84. On July 10, 2014, Cynk's share price hit a high of $21.95 — resulting in a market capitalization of more than $4.5 billion.

85. On July 11, 2014, the Commission issued an order suspending trading in Cynk through July 24, 2014. Kueber could not sell his Cynk shares during the intervening period.

86. After Cynk resumed trading on July 25, 2014, its share price and trading volume fell. On July 28, 2014, its share price closed at $0.60.

## FIRST CLAIM FOR RELIEF
**Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act**

87. Paragraphs 1 through 86 are re-alleged and incorporated by reference as if fully set forth herein.

88. Defendant Kueber, directly or indirectly, by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of Cynk securities, knowingly, recklessly, or negligently, has: (a) employed devices, schemes and artifices to defraud; or (b) has engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of the securities.

89. By reason of the foregoing, Defendant Kueber, directly or indirectly, has violated, and unless enjoined will again violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) & 77q(a)(3)].

## SECOND CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder**

90. Paragraphs 1 through 86 are re-alleged and incorporated by reference as if fully set forth herein.

91. Defendant Kueber, directly or indirectly, in connection with the purchase or sale of Cynk securities, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, has knowingly or recklessly: (a) employed devices,

12

schemes, or artifices to defraud; or (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

92. By reason of the foregoing, Defendant Kueber, directly or indirectly, has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder [15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5(a) & (c)].

## **RELIEF SOUGHT**

**WHEREFORE**, the Commission respectfully requests that the Court issue a Final Judgment:

### I.

Permanently restraining and enjoining Defendant from violating Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) & 77q(a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) & (c)];

### II.

Permanently prohibiting Defendant from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)];

### III.

Permanently prohibiting Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 or that is required to file reports under Exchange Act Section 15(d), pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**IV.**

Ordering Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

**V.**

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
July 31, 2015

By: /s/ Sanjay Wadhwa
Andrew M. Calamari
Sanjay Wadhwa
Michael D. Paley
Wendy B. Tepperman
Preethi Krishnamurthy
Joshua R. Geller
SECURITIES AND EXCHANGE
  COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)
KrishnamurthyP@sec.gov